AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>Madeleine Morgan Sweet<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.

*FILED*

APR 24 2017

CLERK, SUSAN Y. SOONG<br>NORTHERN DISTRICT OF COURT<br>SAN JOSE DISTRICT COURT<br>CALIFORNIA

17. 7060 9   **MAG**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____March 29, 2017_____ in the county of _____Monterey_____ in the _____Northern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(C) | Possession with intent to distribute and distribution of controlled substances |
| | Penalties: 20 years in prison, $1,000,000 million fine, minimum three years supervised release, maximum of lifetime supervised release, $100 special assessment |

This criminal complaint is based on these facts:

See attached affidavit -- incorporated by reference

approved as to form: _____
Jeffrey A. Backhus, Assistant U.S. Attorney

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Shawn Foust, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____April 20, 2017_____

_____
*Judge's signature*

City and state: _____San Jose, CA_____

Hon. Susan van Keulen, U.S. Magistrate Judge
*Printed name and title*

1  BRIAN J. STRETCH (CABN 163973)
   United States Attorney
2
   BARBARA J. VALLIERE (DCBN 439353)
3  Chief, Criminal Division

4  JEFFREY A. BACKHUS (CABN 200177)
   Assistant United States Attorney
5
        150 Almaden Boulevard, Suite 900
6       San Jose, California 95113
        Telephone: (408) 535-5080
7       FAX: (408) 535-5066
        jeffrey.backhus@usdoj.gov
8
   Attorneys for United States of America
9
                    UNITED STATES DISTRICT COURT
10
                 NORTHERN DISTRICT OF CALIFORNIA
11
                        SAN JOSE DIVISION
12

13 UNITED STATES OF AMERICA,            )  Case No.
                                        )
14        Plaintiff,                     )  AFFIDAVIT OF SPECIAL AGENT SHAWN
                                        )  FOUST IN SUPPORT OF CRIMINAL
15   v.                                  )  COMPLAINT
                                        )
16 MADELEINE MORGAN SWEET,              )  [UNDER SEAL]
                                        )
17        Plaintiff,                     )
                                        )
18                                       )
                                        )
19 _____ )

20

21

22

23

24

25

26

27

28
   AFF. IN SUPPORT OF COMPL.
   [UNDER SEAL]
                                    1

## AFFIDAVIT OF DEA SPECIAL AGENT SHAWN FOUST

I, Special Agent Shawn Foust, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION

1.    I make this affidavit in support of an application for a criminal complaint charging Madeleine Morgan Sweet (hereinafter "**Target Subject**") with a violation of Title 21, United States Code, sections 841(a)(1), (b)(1)(C) (possession with intent to distribute and distribution of controlled substances), and in support of an application for a warrant to search the following locations (hereafter collectively referred to as the "**Target Locations**"), described more particularly in Attachment A, for the items specified in Attachment B:

a.    **Target Premises 1**: 400 Laurel Avenue, Pacific Grove, California 93950;

b.    **Target Premises 2**: 664 Newton Street, Monterey, California 93940;

c.    **Target Vehicle**: 2000 dark green, Chevrolet Metro with California License Plate 4MML924; and

d.    **Target Telephone**: Phone number 831-917-8524, a Cellco/Verizon phone subscribed to the **Target Subject** at 400 Laurel Avenue, Pacific Grove, California.

and any computers, other cell phones, or other digital media devices found therein or on the **Target Subject** at the time of their arrest, and to seize certain items that are fruits, evidence, and instrumentalities of violations of Title 21, United States Code, sections 841 (possession with intent to distribute and distribution of controlled substances), 952(a) (importation of a controlled substance), and 843(b) (use of a communication facility to facilitate drug trafficking).  This search shall include all rooms and garages or storage spaces, attached or unattached, that are associated with the **Target Locations**, and any containers, locked or unlocked, located within or attached to the **Target Locations**.

2.    The statements contained in this affidavit are based on my own investigation, my training and experience as a law enforcement agent, information provided to me by or through other law enforcement agents, investigators and individuals with knowledge of this matter, and through my review of documents related to this investigation.  This affidavit summarizes such information in order to show that there is probable cause to believe that the items listed in Attachment B are believed to be in the locations described in Attachment A.  This affidavit does not purport to set forth all of the evidence

gathered to date in this investigation.  Based upon the information below, it is my opinion that there is probable cause to believe that the fruits, evidence, and instrumentalities of violations of 21 U.S.C. §§ 841, 843(b) and 952(a) are likely to be found in the **Target Locations**.

## II.     AGENT BACKGROUND

3.      I am a Special Agent of the Drug Enforcement Administration (DEA) and have been since September of 2009.  As such, I am an investigative or law enforcement officer of the United States empowered by law to conduct criminal investigations within the meaning of 21 U.S.C. § 878(a); that is, an officer who is empowered by law to conduct investigations, make arrests, and seize property for violations of Titles 18 and 21 of the United States Code.

4.      As part of my training to become an agent, I have received 19 weeks of specialized training at the DEA Academy in Quantico, Virginia.  This training included several hundred hours of comprehensive, formalized instruction regarding numerous subjects, including, but not limited to: basic narcotics investigations, drug identification, familiarization with United States narcotic laws, financial investigations and money laundering, identification and seizure of drug-related assets, undercover operations, and electronic and physical surveillance procedures.  Prior to joining the DEA, I was employed by the Department of the Air Force as a Commissioned Officer and was honorably discharged as a Captain April 2009.

5.      I studied a curriculum of a Bachelor of Arts and Sciences from Texas State University and a Master of Science from the Naval Postgraduate School as well as law enforcement related training thereafter.  My studies included classes in law enforcement psychology, state, federal, international law, diplomacy and history of search warrant application.  Additionally, I studied illegal financing and distribution associated to the illegal drug trade as it relates to terrorist financing and illegal drug trafficking organizations.

6.      While with DEA, I have participated in numerous investigations of drug trafficking organizations.  I have conducted or helped conduct physical and electronic surveillance, including using electronic physical location data, of drug trafficking suspects regularly.  I have participated in the execution of federal and state search warrants relating to drug trafficking investigations.  On numerous occasions, I have debriefed defendants, informants, and witnesses who had personal knowledge regarding

1  drug trafficking organizations.  As a result of my participation in these and other activities, I am familiar

2  with the use of physical surveillance, toll records, undercover agents, confidential informants,

3  cooperating witnesses, search warrants, grand jury subpoenas, financial and other business records,

4  witness interviews, trash covers, pole cameras, GPS tracking devices, and mail covers to conduct

5  investigations into drug trafficking organizations.

6        7.      Through my work and training to become a DEA agent, I am also familiar with the

7  manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded

8  communications or slang-filled telephone conversations, false or fictitious identities, and other means to

9  facilitate their illegal activities and thwart law enforcement investigations.  Based upon my training and

10  experience, I know that it is common practice for narcotics traffickers to use pagers, telephones, and/or

11  cellular telephones in order to communicate with their customers, suppliers, couriers, and other co-

12  conspirators in order to insulate them from detection by law enforcement.  Moreover, it is common for

13  them to initiate such service under the name of an associate or fictitious name.  Furthermore, it is

14  common for narcotic traffickers to utilize false or incomplete address(es) while filling out subscriber

15  information related to their cellular phone(s) in an effort to secret their illegal activities.

16        8.      As a DEA agent, I have also monitored and conducted surveillance, as well as participated

17  in an investigation involving the direct interception of communications.  I have attended training classes

18  specializing in conducting electronic surveillance. I have had the opportunity to monitor, listen to, review

19  transcripts or line sheets or monitor's logs prepared by linguists and/or otherwise discussed with linguists

20  the content of intercepted conversations, the majority of which were in the Spanish language and

21  involved the trafficking of heroin and methamphetamine by Mexican Drug Trafficking Organizations

22  ("DTOs"), which often employ coded communications to thwart law enforcement.

23        9.      By virtue of my training and experience, and through my conversations with other agents

24  and law enforcement officers that conduct drug investigations, I have become familiar with the methods

25  used by drug traffickers to import, transport, safeguard, and distribute drugs, and the methods used by

26  drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

27        10.     I have personally become familiar with the facts and circumstances of the investigation

28  discussed in this Affidavit.  I am familiar with the facts and circumstances of the investigation through

1  my personal interaction with Monterey County Sheriff's Office employees who originated the

2  investigation and collected the majority of evidence. Unless otherwise noted, wherever in this affidavit I

3  assert that a statement was made, the information was provided by another DEA agent, law enforcement

4  officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I

5  or others have spoken, or whose reports I have read and reviewed.  Such statements are among many

6  statements made by others and are stated in substance and in part unless otherwise indicated.  Throughout

7  this Affidavit, all sentences that begin with the words "I believe" are based upon such information as well

8  as my training and experience.

9  **III.   RELEVANT STATUTES**

10        11.     21 U.S.C. § 841(a)(1) makes it unlawful for a person to knowingly or intentionally

11  manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense,

12  controlled substances, including fentanyl, a Schedule II controlled substance.

13        12.     21 U.S.C. § 843(b) makes it unlawful to use a communications facility, including a

14  cellular telephone, to facilitate a violation of Title 21.

15        13.     21 U.S.C. § 952(a) makes it unlawful for a person to import, among other things, Schedule

16  II controlled substances, including fentanyl.

17  **IV.   PROBABLE CAUSE**

18        **A.     Overview**

19        14.     This case arises out of an investigation initiated by the Monterey County Sheriff's Office

20  (MCSO) who provided information to the Drug Enforcement Administration (DEA) relating to MCSO

21  who are investigating the drug trafficking activities of the Madeleine Sweet Drug Trafficking

22  Organization (DTO).  As further detailed below, I believe that that the **Target Subject** is involved in

23  importation and/or manufacturing fentanyl in the **Target Premises 1** and **Target Premises 2**, distributing

24  fentanyl using the **Target Vehicle** and the **Target Telephone** and intends to receive more fentanyl for

25  further distribution via a package to arrive to the **Target Subject** in the near future and then distribute the

26  illegal substance to customers within the United States.

27        15.     Fentanyl, a Schedule II controlled substance, is a highly potent opiate that can be diluted

28  with cutting agents and ingested in a variety of ways.  In this case the **Target Subject** instructed potential

1   customer in the detailed method of ingesting the drug via a nasal spray.  However, small variations in the

2   amount or quality and quantity of fentanyl used can have significant effects on the potency of the drug,

3   raising the danger of overdoses.

4      16.      As detailed below, beginning in September 2016, the MCSO have investigated the sale of

5   narcotics through a website called Reddit (www.reddit.com).  The Reddit web page and associated user

6   information have been used by the **Target Subject** to sell drugs and communicate with customers.

7   Reddit is a social news aggregation, web content rating, and discussion website.  Reddit's registered

8   community members can submit content, such as text posts or direct links.  Registered users can then

9   vote submissions up and down to organize the posts and determine their position on the site's pages.  The

10  submissions with the most positive votes appear on the front page or the top of the category. Content

11  entries are organized by areas of interest called "subreddits".

12     17.      An MCSO Deputy who acted in an undercover (UC) capacity gained access to the **Target**

13  **Subject** and collected information regarding the **Target Subject**'s willingness to distribute fentanyl.

14     18.      In the month of November 2016, the UC discovered numerous subreddits whose primary

15  purpose is to facilitate the sales of narcotics:

16  • https://www.reddit.com/r/opiaterollcall - Primarily focused on the sales of Opiates
    • https://www.reddit.com/r/Stimsrollcall/ - Primarily focused on the sales of Stimulants
17  • https://www.reddit.com/r/PsychotropicPhoneBook - Primarily focused on the sales of Psychotropic's

18

19     19.      These subreddits are further broken down into individual "threads".  As shown below,

20  these threads organize the subreddit based on month and State (e.g. January-California):

21

22

23

24

25

26

27

28

20.     These subreddits have the following (or similar) set of rules posted at the top of each thread:



21.     While monitoring different California threads, the UC began to realize that users on these narcotics based "subreddits" refer to narcotics dealers as "friends".  When a user is involved in the sales

1    of narcotics, they will advertise they are a "friend". When users are seeking an individual to purchase

2    narcotics from they will post they are "looking for a friend". The two parties will then communicate via

3    private messages to confirm the specifics of the narcotics transaction.

4        22.    As shown below, on March 1, 2017, the UC created an account on www.reddit.com

5    named 'throaawaythroaway123'. On March 03, 2017, the UC used this account to post a comment in the

6    'California – March' thread of the opiate subreddit stating "831 looking for a friend!!". An account

7    named 'imokoffthat' replied to the comment stating "can help in 831".

8        23.    Moments later, the UC's www.reddit.com account received a private message from the

9    same (imokoffthat) account advertising the sales of Furanyl-Fentanyl, a Schedule II controlled substance,

10   in the Monterey area.

11       24.    Based on my training and experience, I am aware that Furanyl-Fentanyl is a dangerous

12   chemical analogue which is mass-produced in clandestine labs overseas and then smuggled into the

13   United States via mail. I also know that, due to its potency, even in extremely small quantities, numerous

14   narcotics experts and medical professionals have heralded Furanyl-Fentanyl as an extremely dangerous

15   substance. This is because, among other reasons, the clandestine laboratories where the Furanyl-Fentanyl

16   is processed have little, if any, quality control.

17       25.    The person using the moniker 'imokoffthat' went on to detail how, because of the high

18   potency of Furanyl-Fentanyl, they custom manufacture a nasal-spray applicator to ingest the substance.

19   The user of 'imokoffthat' went on to advise the UC that the user of 'imokoffthat' would tailor the

20   concentration of Furanyl-Fentanyl to the UC's specific tolerance to opiates.

21       26.    Eventually, the UC provided the user of 'imokoffthat' with a phone number and the UC

22   requested they send the UC a text message. Shortly thereafter, the UC received a text message on his cell

23   phone from a (831)917-8524 number. The text message identified the sender as a "Maddie".

24       27.    The UC conducted a records check for that phone number and located a Police Report

25   taken by Monterey Police Department in July of 2016 for a Drug-D.U.I. The suspect in that case was

26   identified as a Madeleine Sweet (**Target Subject**). The **Target Subject** reported her address to the

27   Monterey Police as a 400 Laurel Avenue, in Pacific Grove, California, **Target Premises 1**.

28       28.    I issued an administrative subpoena to Cellco/Verizon and learned that the phone number

AFF IN SUPPORT OF SEARCH WARRANT AND COMPLAINT
(FILED UNDER SEAL)                                                    8

1  was subscribed to Mary Sweet (believed to be the **Target Subject**) at 400 Laurel Avenue, in Pacific

2  Grove, California (**Target Premises 1**).

3        29.    The UC continued to text the **Target Subject** throughout the evening and eventually the

4  **Target Subject** offered to provide the UC with a 10mg-10ml solution of Furanyl-Fentanyl in a 30ml

5  nasal-spray bottle for $50.  The **Target Subject** also offered to "throw in" an extra 30mg of Furanyl-

6  Fentanyl powder.

7        30.    The UC and the target subject ultimately agreed to conduct the transaction the following

8  Tuesday, at a location near downtown Pacific Grove.  However, due to administrative issues, the UC had

9  to cancel the narcotics purchase.  The **Target Subject** then began to suspect she was texting a law

10  enforcement officer and asked the UC to "friend" her on Facebook in order to prove the UC was "not a

11  cop".  The UC advised the **Target Subject** he did not have a Facebook.  The **Target Subject** then sent

12  the UC links to numerous social media websites, asking the UC to friend her on any of them.  Several of

13  the links contained a picture of a woman later identified at the **Target Subject**.

14        31.    The UC advised the **Target Subject** he did not feel comfortable friending her on Social

15  Media since the UC claimed he did not know whether *she* was an undercover law enforcement officer.

16  The UC then stopped texting the **Target Subject** for a short period.

17        32.    On March 9, 2017, the UC texted the **Target Subject** again asking if she still had a

18  "bottle", referring to the nasal spray bottle containing Furanyl-Fentanyl.  The **Target Subject** advised the

19  UC she did not, since she had sold all of it already.  At the end of conversation, the **Target Subject**

20  stated she would advise the UC when she would have any fentanyl for sale again.

21        33.    On March 10, 2017, the **Target Subject** sent the UC a text message from the **Target**

22  **Telephone** advising she had "ordered more".  On March 13, 2017, the UC texted the **Target Subject**

23  inquiring if "anything had changed".  The **Target Subject** advised the UC "They haven't sent me

24  tracking yet" and that "its shipped from the NL".  The UC understood "NL" to mean the Netherlands.

25        34.    On March 22, 2017, the UC texted the **Target Subject** on the **Target Telephone** asking

26  "Hey, how's it going?"  The **Target Subject** advised the UC the shipment was going through customs in

27  San Francisco.

28        35.    On March 27, 2017, the **Target Subject** advised the UC she had received a shipment of

Furanyl-Fentanyl.  She advised the UC she had "25 people legit blowing up my inbox", the UC understood that to mean she had numerous people attempting to purchase narcotics from her.  the **Target Subject** texted the UC the following image as a "price sheet" using the **Target Telephone**:



36.     The UC replied to the **Target Subject** requesting 1 gram of Furanyl-Fentanyl.  The **Target Subject** advised the UC that would require three bottles, each bottle costing another $10.  The UC asked the **Target Subject** if she could just "do" two bottles.  The **Target Subject** agreed, stating she would package the remaining third in a "stealthy as fuck container".

37.     The **Target Subject** and the UC agreed to conduct the narcotics transaction in the parking lot of the Nob Hill store in Pacific Grove (located at 900 Lighthouse Ave, Monterey, CA 93940) on March 29, 2017, at 11:00 a.m.  The **Target Subject** advised the UC that she may send her boyfriend (later identified as Everett Reed (hereafter "REED")) to conduct the transaction.

38.     As explained in more detain below, on March 29, 2017 at 11:00 a.m., the UC met with a female the UC recognized to be **Target Subject** in the Nob Hill Parking lot and purchased 1 gram of Furanyl-Fentanyl for $170.00.  During the transaction, the UC was equipped with a wireless recording device that maintained a digital audio recording of the meeting.  Other MCSO's conducted surveillance of the meeting and obtained photographs.

39.     Once at the parking lot, the UC and surveillance officers observed the **Target Subject** exit the passenger side door of the **Target Vehicle** which is registered to REED.  An individual later identified as REED had driven the **Target Vehicle** to the meeting location and waited in the vehicle as the **Target Subject** met with the UC.  Once the **Target Subject** got out of the **Target Vehicle**, she walked to the UC's vehicle, which was parked nearby, and entered the passenger side.

40.     The **Target Subject** met with the UC in the UC vehicle and spoke about the sale and the proper dosage amounts for drug so that the UC would not overdose.  The **Target Subject** expressed concerns about the UC overdosing which appeared to demonstrate her knowledge of how dangerous the drug was.  The **Target Subject** then provided the UC with one gram of powdered fentanyl which included two pre-mixed droppers of solution.  Initially, the UC gave the **Target Subject** a total of $180.  The **Target Subject** then got out of the UC's vehicle and returned to REED's vehicle to see if he had $10 in change to give back to the UC.  Ultimately, the UC allowed **Target Subject** to keep the extra $10 after REED was unable to offer change to the **Target Subject**.  The **Target Subject** and the UC agreed the additional $10 would be levied toward a future drug transaction.

41.     Law enforcement maintained surveillance was maintained on the **Target Vehicle** following the transaction as REED and the **Target Subject** left the location.  The **Target Vehicle** then travelled to **Target Premises 1** where the **Target Subject** exited the **Target Vehicle** and walked in the front door of **Target Premises 1** while REED stayed in the **Target Vehicle**.  After approximately three minutes, REED entered **Target Premises 1** and closed the door.

42.     The **Target Subject** also informed the UC that she recently moved in with REED who is known to live at **Target Premises 2**.  Based on surveillance, law enforcement believes that the **Target Subject** lives at **Target Premises 1** and **Target Premises 2**.

43.     On April 5, 2017, I transported the drugs purchased by the UC from **Target Subject** on March 29, 2017 (hereafter referred to as **Exhibit 1**) to the DEA Western Regional Laboratory for further analysis.

44.     On April 10, 2017, a DEA Senior Forensic Chemist determined **Exhibit 1** contained fentanyl and methamphetamine.

45.     On April 13, 2017, a DEA Fingerprint Specialist located fingerprints on the packaging that

1  contained **Exhibit 1** that were later determined be the fingerprints of the **Target Subject**.

2  46.    On April 18, 2017, the UC made contact with the **Target Subject** and the **Target Subject**

3  advised the UC she was expecting another shipment of fentanyl at the "end of the week" which your

4  affiant believes means at or about April 21, 2017.

5  47.    Based on the history of the investigation, I believe that the **Target Subject** will receive

6  the new shipment of fentanyl in the near future.

7  48.    On April 18, 2017, surveillance was established at the **Target Premises 2** where the

8  **Target Subject** was observed sitting on the curb rummaging through her purse next to the **Target**

9  **Vehicle** parked directly in front of **Target Premises 2**.  The **Target Subject** was observed as she stood

10  up and walked onto the property and to the open garage door of **Target Premises 2**.

11  49.    On the same date, the **Target Subject** was observed walking on the driveway away from

12  the house to the **Target Vehicle** where she unlocked the driver's side door and sat inside, leaving the

13  driver's door open.  Moments later, REED was observed as he walked from **Target Premises 2** to the

14  **Target Subject** and handed something to the **Target Subject**.  The **Target Subject** manually locked the

15  driver's door of the **Target Vehicle** and the **Target Subject** and ~~SWEET~~ REED walked into the open garage

16  door of the **Target Premises 2**.

17  50.    On the same date, the **Target Subject** was observed walking with ~~SWEET~~ REED from the

18  **Target Premises 2** to the **Target Vehicle**.  Once at the vehicle, the **Target Subject** entered the driver's

19  seat and REED entered the front passenger seat and departed the area.

20  **V.    ANTICIPATED ITEMS TO BE FOUND AT THE TARGET LOCATIONS**

21  **A.    General Knowledge Regarding Drug Trafficking**

22  51.    Based on my training, experience, and participation in this and other narcotics trafficking

23  investigations and upon my consultation with other experienced law enforcement officers, I know the

24  following information regarding individuals, involved in drug trafficking:

25  a.    These persons often maintain documents pertaining to the possession,

26  manufacture, importation, exportation, and/or distribution of controlled substances and illegal proceeds,

27  including invoices, shipping labels, tracking numbers, boxes, and envelopes at their residences, stash

28  houses, and/or in their vehicles where they are available for reference and concealed from law

AFF IN SUPPORT OF SEARCH WARRANT AND COMPLAINT
(FILED UNDER SEAL)                    12

1   enforcement;

2      b.  Drug traffickers commonly store drugs and drug paraphernalia, including

3   packaging materials, cutting agents, and manufacturing tools in their residences, stash houses, and/or

4   vehicles in order to have ready access to the drugs and/or paraphernalia in order to conduct their drug

5   trafficking business or to use those drugs personally;

6      c.  Drug traffickers attempt to mask the distinct odors of particular drugs through the

7   use of heat sealing and/or canning devices and/or aromatic substances such as laundry soap, dryer sheets,

8   air fresheners, or axle grease. Also, drug traffickers will utilize a layering system which includes the use

9   of several packaging layers to decrease the scent;

10      d.  Fentanyl traffickers often dilute, or "cut," drugs in order to maximize the volume

11   of drugs they have to sell, and thus their profits.  Both pill manufacturers and those that sell their product

12   in powder form for other methods of ingestion.  Illicit pill manufacturers commonly use fentanyl as a

13   replacement for Oxycodone which mimics the effects but a much low price to the manufacturer. Pill

14   traffickers use various other substances to dilute drugs, including mannitol, mannite, lactose, Vitamin

15   B12, and MSM.  Illicit pill traffickers use equipment, such as manual and automated pill-press machines,

16   scales, sifters, hammers, grinders, razor blades, glass panes, mirrors and kilo or pound presses as part of

17   the dilution or "cutting" process.  Once the drug has been "cut," drug traffickers usually will repackage it,

18   often in smaller quantities, using masking agents, tape, heat sealers and heat sealed bags, ziplocs bags,

19   hermetically sealed pouches, and/or other containers for redistribution.  Fentanyl traffickers who dilute

20   the drug in water based solutions often maintain supplies of saline, bacteriostatic waters and the like to

21   dissolve the highly toxic and potent substance in before users inhale it through the nasal passage or inject

22   the substance. It is common for illicit pill/liquid based traffickers to maintain such equipment and

23   supplies in their residences, stash houses;

24      e.  Drug traffickers keep books, receipts, notes, ledgers and other forms of records

25   specifically relating to their drug distribution activities.  Because drug trafficker's often "front" drugs to

26   their customers – that is, sell the drugs on credit – or receive drugs from their suppliers on credit, such

27   documentation is necessary to keep track of the amounts paid and owed with respect to their customers

28   and suppliers.  These ledgers are more commonly known as "pay/owe sheets" and may be as simple as

AFF IN SUPPORT OF SEARCH WARRANT AND COMPLAINT

notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets, and are frequently encoded in order to protect those involved. Drug traffickers often keep such records on their person or in their residences, stash houses, and/or vehicles;

    f.  Drug traffickers commonly keep large sums of currency, financial instruments, precious metals, jewelry, gift cards, and other items of value which represent either the proceeds from drug sales or are intended for the purchase of controlled substances. When drug traffickers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement. To accomplish this, drug traffickers often use different techniques, including the use of digital currency, foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source. Drug traffickers also purchase real estate or vehicles, and establish shell corporations and business fronts that they use to launder drug proceeds. Drug traffickers often utilize fictitious or "straw-holder" owners to conceal the true ownership, vehicles, or other valuable items purchased with the proceeds of illicit drug sales. In addition, drug traffickers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution business. Drug traffickers often keep these items of value, and records relating to them, on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available.

    g.  Drug traffickers go to great lengths to hide and secure the drugs, drug proceeds, other items of value and records relating to their drug business. This is to safeguard those items against robbery and keep them from law enforcement. These secure locations typically include safes, vaults, or other locked containers, as well as specially constructed concealed compartments such as those often found in vehicles used specifically to facilitate drug trafficking. Other methods of concealment include the burial of such items underground, the use of locked vehicles, trailers, out buildings, sheds, and/or exterior closets, the use of natural spaces within walls, furniture, vehicles, and other areas, and the use of sealed cans and canning machines;

    h.  Drug traffickers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the

United States.  They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another.  They often use hand-written air bills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement.  Drug traffickers frequently maintain records relating to their use of these services, such as receipts, copies of air bills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash houses, and/or in their vehicles where they are available for reference.

i.      Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package and deliver the drugs and persons to launder the drug proceeds.  These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities.  These records are typically maintained on their person or in their residences, stash houses, and/or vehicles, so they are readily available in order to efficiently conduct their drug trafficking business.  Moreover, such records are often stored electronically within the memory of telephones, computers, and/or personal digital assistants such as iPhone and Blackberry devices;

j.      Drug traffickers often use cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities.  Drug traffickers often keep these items on their person or in their residences, stash houses, businesses, and/or vehicles where they are readily available;

k.      Drug traffickers often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, or to transport drugs or drug proceeds.  Documents relating to

1  such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent use club

2  membership information and records associated with airlines, rental car companies, and/or hotels, airline,

3  hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, are

4  often maintained by drug traffickers in their residences, stash houses, and/or vehicles where they are

5  readily available for use or reference;

6          l.      Drug traffickers frequently possess firearms, ammunition, silencers, explosives,

7  incendiary devices, and other dangerous weapons to protect their profits, supply of drugs, and persons

8  from others who might attempt to forcibly take such items and/or harm them during transactions.  Such

9  weapons, which are often stolen or otherwise possessed illegally, are typically maintained on their person

10  or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and

11  readily available;

12          m.     Drug traffickers often utilize two way radios, police scanners, video surveillance

13  systems, and other counter surveillance equipment to prevent detection by law enforcement, and that such

14  items are typically maintained at their residences, stash houses, and/or in their vehicles.

15          n.      Drug traffickers frequently take, or cause to be taken, photographs and/or videos of

16  themselves, their criminal associates, their real and personal property, their weapons, and their drugs, and

17  that such items are often stored on their person, in their residences, and/or vehicles;

18          o.      During the course of a search it is not uncommon to find items of personal

19  property that tend to identify the person(s) in residence occupancy, control, or ownership of the place

20  being searched vehicle, such as cancelled mail, deeds, leases, titles, registration information, rental

21  agreements, photographs, videos, diaries, utility and telephone bills, tax documentation, travel

22  documents, statements, passports, driver's licenses and/or identification cards, immigration

23  documentation, birth certificates, and keys.

24  **B.**     **Information Regarding Seizure Of Computers And Related Storage Materials**

25      52.    Based on my own training and experience and conversations with other agents, I know

26  that drug traffickers often store information regarding their illicit activities on computers and related

27  electronic storage devices. Investigators know **Target Subject** has used the internet, social media and her

28  cell phone in pursuit of her drug trafficking activities. **Target Subject** has a proven history on the

AFF IN SUPPORT OF SEARCH WARRANT AND COMPLAINT

"internet." Accordingly, permission is sought herein to seize and search computers and related devices, consistent with the scope of the requested search.

53.     The information stored in an electronic format may be found not only on the hard disk drive of a computer, but on other computer hardware, peripherals, and storage media. In order to conduct a thorough search of computers, agents are often required to seize most or all of the computer hardware to be searched later by a qualified expert in a laboratory or other controlled environment. This is true for the following reasons:

a.   *Volume of Evidence*:  Computers and storage devices (like hard disks, diskettes, tapes, CD-ROMs, DVDs, and zip drives) can store the equivalent of thousands of pages of information. Also, when the user wants to conceal criminal evidence, he or she may store it in many places, in random order, and with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take several weeks to conduct, and it would be impractical to attempt this kind of data search on site.

b.   *Technical Requirements*:  Searching computer systems is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment needed to conduct a thorough search. In addition, it may be necessary to consult with personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

c.   *Files May Be Hidden, Erased, Compressed, Password Protected, or Encrypted*:  The data search procedures used to recover electronically stored evidence are designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password protected, or encrypted files. Without knowing the password for encrypted files, it may be impossible to view the information in those files. This is especially true with certain encryption algorithms and/or programs, such as Elgamal, Diffie-

1    Hellman, DSA, and Triple-DES.  Even less secure encryption programs may require

2    considerable time or outside agency assistance to decrypt the files absent a password.

3    d.  *Danger of Destruction of Evidence*:  Computer evidence is extremely vulnerable to

4    inadvertent or intentional modification or destruction, both from external sources and

5    destructive codes embedded in the system such as a "booby trap."  In order to maintain

6    the integrity of the original evidence, a qualified expert may need to conduct a forensic

7    examination of the storage media in a controlled environment, such as a law

8    enforcement laboratory, where specific procedures and specialized software designed

9    to protect the integrity of the original media will be used.

10    54.    In order to retrieve electronically stored evidence from a computer, agents may be

11    required to seize most or all of a computer system's equipment, including hardware, peripherals,

12    software, documentation, security devices, and passwords.  This is true because certain operating systems

13    and hardware can be configured to operate only with a precise set of hardware, software, and peripherals.

14    Peripheral devices that allow users to enter or retrieve data from the storage devices may vary in their

15    compatibility with other hardware and software.

16    55.    The Computer Forensic Agent may have to install software used by the suspect on a

17    government computer in order to retrieve the information the suspect may have stored using that

18    software.  The Computer Forensic Agent may also need to refer to hardware and software documentation

19    maintained by the suspect to complete his/her analysis in a timely manner.  The suspect's computer

20    documentation may also contain hand-written notes specific to the seized computer system.  Physical

21    keys, encryption devices, and similar items may be necessary to gain access to computer equipment.

22    Passwords, pass-phrases, password files, and similar decryption codes may be required to access specific

23    information stored on the seized computer system.

24    56.    Due to the facts outlined above, it is requested that agents serving this search warrant be

25    authorized to employ the procedure described in Attachment C, which is the standard computer search

26    protocol for the Northern District of California, upon the execution of this search warrant.

27    **C.    Potentially Hazardous Materials**

28    57.    As detailed above, **Target Subject** may have facilities in the **Target Premises(s)** for the

1 processing and/or manufacturing of fentanyl-laced products.  Based on my training and experience and

2 consultation with a DEA Clandestine Laboratory Site Safety Officer, I know that the handling of

3 clandestine laboratory chemicals without proper supervision and facilities has caused in the past

4 explosions, fires, cross contamination to neighboring structures, and other events that have resulted in

5 injuries and health problems.

6      58.    Because of these facts and because the DEA San Francisco Division Office has no

7 adequate safe storage facilities, your affiant requests authorization by supplemental order to dispose of

8 any fentanyl manufacturing or conversion equipment and chemicals in event of their discovery and if

9 such equipment and chemicals cannot be safely stored.  Such an order will require that (1) photographs

10 will be taken of the chemicals and their containers, and their containers and/or labels will be maintained

11 as evidence if those containers and/or labels pose no hazard; but (2) if in the DEA agents' opinion,

12 sampling of these chemicals poses a significant risk to the assembled officers and agents, then the

13 chemicals will be destroyed but only after photographs have been taken and every effort made to

14 maintain their original containers.

15 **VI.    CONCLUSION**

16      59.    Based on the foregoing, it is my opinion that there is probable cause to believe that the

17 **Target Subject** has violated Title 21, United States Code, section 841(a)(1), (b)(1)(C), and that the

18 **Target Locations** will contain evidence, fruits, and instrumentalities of violations of Title 21, United

19 States Code, Sections 841, 843(b) and 952(a), and that the **Target Subject** may be found there.

20 Therefore, I request that the Court issue complaints against the **Target Subject** and a warrant authorizing

21 agents to search the **Target Locations**.

22      60.    Since this investigation is continuing, disclosure of the complaint, the search and seizure

23 warrants, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of

24 the investigation and potentially endanger the agents and confidential sources working on the

25 investigation.  It may also cause the **Target Subject** and other co-conspirators to flee and/or destroy

26 evidence of their crimes.  Accordingly, I request that the Court seal the application, this affidavit, the

27 complaints, the warrants and the supporting papers, except that the Clerk of the Court be directed to

28 provide copies of these documents to the United States Attorney's Office and/or the Drug Enforcement

1    Administration for use in connection with this case.

2        I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

3

4    Dated:  April ⟨20⟩, 2017                                       _____
                                                             SHAWN FOUST
5                                                            Special Agent, DEA

6

7    Subscribed and sworn to before me this ⟨20th⟩ day of April 2017 in San Jose, California.

8

9    _____
     HONORABLE SUSAN VAN KEULEN
10   United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     AFF IN SUPPORT OF SEARCH WARRANT AND COMPLAINT
     (FILED UNDER SEAL)                         20